IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | |
|---|---|
| **KOTY WILLIAMS,** | ) |
| **Plaintiff,** | ) ) |
| v. | ) ) 7:20-cv-00497-LSC |
| **AKEEM EDMONDS,** *et. al*, | ) ) |
| **Defendant.** | ) ) |

### MEMORANDUM OF OPINION

Plaintiff Koty Williams ("Williams"), who was an inmate at the Bibb County Correctional Facility ("BCCF"), brings this action under 42 U.S.C. § 1983 against Defendant Octavia Ingram ("Ingram"),[1] who worked as a Certified Registered Nurse Practitioner at the BCCF health care unit ("HCU"), asserting a violation of the Eighth Amendment. Before the Court is Ingram's Motion for Summary Judgment. (Doc. 18). For the reasons stated below, the motion is due to be granted.

**I.   BACKGROUND**[2]

---

[1]   The Court recognizes that Ingram holds a Doctorate in Nursing, but because both parties refer to her as "Ingram" rather than "Dr. Ingram" in their pleadings, *see e.g.*, doc. 60, the Court refers to her as "Ingram" in this Opinion.

[2]   The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes

At 10:00 AM on November 27, 2018, Williams was brought to the BCCF HCU in a wheelchair by prison staff. Williams claims that he reported to HCU staff that he had just been assaulted by correctional officers, that his hip was broken, and that the pain he was in "was the worst of the worst." (Doc. 65-1, pp. 88-91).

When he first arrived at the HCU, Williams was initially examined by Shondrell Johnson ("Johnson"), an HCU Registered Nurse. Johnson noted on an intake form that Williams was "breathing with ease, . . . [a]ble to move all extremities," reporting sharp pain to his left hip at a level of 4 out of 10, and reporting sharp pain to his left side at a level of 7 out of 10. (Doc. 60-2, p. 2). Ingram also examined Williams. In Ingram's progress notes, she wrote that Williams had "even and unlabored" breathing, "limited movement to left hip," and was "unable to perform passive [range of motion] on left side." (*Id.* p. 3). Neither Johnson nor Ingram reported any bruising on Williams's hip. (*Id.* p. 99:20). After assessing Williams, Ingram consulted with Wendy Walker ("Dr. Walker"), the Medical Director of BCCF, about the appropriate course of treatment.

---

only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . .").

By 10:04 AM, Ingram's notes indicate that she ordered an x-ray of Williams's left hip and ordered him to receive a 60 mg injection of Toradol—a treatment which, according to Ingram's testimony, can only be given once every 24 hours. (*See* doc. 60-3, p. 70). Ingram further testified that she told Williams to stay in the wheelchair to limit the mobility of his hip in order to avoid further injury (*id.*, p. 67), and instructed him to "keep in [the] infirmary until scans are performed." (Doc. 60-2 pp. 3-4). An x-ray technician then performed an x-ray of Williams's left hip and sent the images to an off-site radiologist.[3] Ingram reported to Dr. Walker that the x-ray technician "didn't think there was anything on the x-ray." (Doc. 60-3, pp. 48-49).

After receiving treatment, Williams was transported back to his cell in the wheelchair by prison officials. (Doc. 65-1, p. 100). Williams remained in his dorm without receiving further treatment until he was ultimately sent to the ER the following day. Williams testified that he was unable to walk or get out of bed while he was in his dorm for this time. (Doc. 65-1, p. 106:13-16). Williams did not testify

---

[3] Whether Ingram looked at the x-rays before sending them to the radiologist is disputed. Williams at first testified that "after the x-ray and stuff was over with, I heard Ms. Ingram make the statement that seen—she did see that there was a hairline fracture, or there was a—that my leg was broke. That she could tell—she could tell that something was wrong." (Doc. 65-1, p. 95:4-9). However, Williams later testified that Ingram "said there was some abnormalities in the x-ray, but she wanted to confirm that to be read by a radiologist." (*Id.* at p. 120:5-8). Ingram claims that she did not look at the x-ray before it was sent to the radiologist and that the x-ray technician said she "didn't see anything, but I'm going to let the radiologist confirm it because I can't give a final report." (Doc. 60-3, p. 12).

that he was in any pain while in his dorm, or that he asked any prison personnel for additional pain treatment. *See generally, id.*

At 8:57 AM on November 28, Dr. Walker received the radiologist's report and discovered what appeared to be a mistake—the report indicated that Williams had a fractured *right* hip, when Ingram reported his injury was to his *left* hip. Dr. Walker thereafter provided the report to Ingram, discussed the apparent mistake, and instructed her to contact the radiologist. Ingram claims that, at this point, she and Dr. Walker were unsure whether the radiologist's report was based on the wrong patient's x-ray, or if the radiologist had made some other mistake in making his report.[4] Ingram then called the radiologist's office, spoke to someone who "was not anyone who could read the results," and that person told Ingram they would "pass along [her] concern and . . . be back in touch." (Doc. 60-3, p. 54:8-13). Some time later, when the office had not callerd her back, Ingram called again and was told "she still hadn't heard anything back." (*Id.*).

At 3:30 PM on November 28, the radiologist called Ingram to notify her that the radiology report did, in fact, contain a typo—the x-ray was of Williams's left hip,

---

[4] *See* Doc. 60-3 p. 10:1-8 (Ingram quoting Dr. Walker saying "how do we even know this is even the right person that they sent an x-ray report back on? . . . You need to get on the phone."); *see also id.* at p. 73:19-21 (Ingram quoting Dr. Walker saying "we don't want to send a patient in to have anything surgically repaired and they operate on the wrong limb.").

and the left hip was fractured. At 4:04 PM, the radiologist sent Ingram a corrected radiology report, Ingram ordered Williams to be brought back to the HCU, and she immediately began arranging for Williams to be sent to a nearby emergency room for treatment.

When Williams arrived back at the HCU, Ingram examined him again and filled out a "Referral Request." (Doc. 60-2, p. 10). On the Referral Request, Ingram wrote that Williams reported a "pain score of 10 on a 1-10 scale." (*Id.*). She also noted Tylenol #4 as his "current medications." (*Id.*) However, although Ingram prescribed Williams Tylenol #4 after hearing him report his pain, he did not receive the medication because he was immediately sent to the ER. Ingram testified that she believed Williams might have had surgery that day and did not let him take the prescribed medication because "you don't give any pain medication . . . before you send [a patient] out for sedation." (*Id.* at p. 92).

At 5:00 PM, Williams left BCCF for treatment at the emergency room, where he was treated by Dr. Scott Powell. Dr. Powell testified that he would normally treat a patient at Williams's age with this injury non-surgically, by instructing them to use "[c]rutches and just stay off of it." (Doc. 60-4, p. 15). However, Dr. Powell opted to treat Williams with surgery because of his past experiences with inmates disregarding such instructions. (*See id.*). After the surgery, Williams returned to the

HCU to recover for the next two weeks. During this time, or shortly thereafter, Williams was treated by Ingram and Dr. Walker for an infection resulting from the surgery. Williams testified that Ingram and Dr. Walker "put me on Vancomycin and IV antibiotics, and they was packing it with . . . some kind of packing every day and doing dressing change and stuff." (Doc. 65-1, p. 124).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213-14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (*per curiam*) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III.   ANALYSIS

Williams's Eighth Amendment claim is based upon the treatment he received from Ingram for his pain and the delay between his arrival at the HCU and being sent to the emergency room. A prison official violates the Eighth Amendment by being deliberately indifferent to a prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 97 (1976). To demonstrate deliberate indifference, a plaintiff must establish (1) a serious medical condition; and (2) a prison official's deliberate indifference to that condition. *See Bingham v. Thomas*, 654 F.3d 1171, 1176 (11th Cir. 2011).

The evidence, when viewed in a light most favorable to Williams, shows the pain he was experiencing amounted to a "serious medical need." *See Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotation and citation omitted). "Severe pain that is not promptly or adequately treated can also constitute a serious medical need depending on the circumstances." *Melton v. Abston*, 841 F.3d 1207, 1222 (11th Cir. 2016) (per curiam). Therefore, the only issue for the Court is whether Ingram was deliberately indifferent to Williams's pain.

To show a prison official was deliberately indifferent to a prisoner's pain, the prisoner must show the prison official (1) had subjective knowledge of the prisoner's severe pain; and (2) *intentionally* disregarded that pain. *See Bingham*, 654 F.3d at 1176 (quoting *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004)). Assuming Williams could show Ingram had subjective knowledge that he was experiencing severe pain, a fact which is hotly disputed,[5] he nonetheless fails to provide sufficient evidence for a reasonable factfinder to conclude Ingram intentionally disregarded his pain.

The Eleventh Circuit has recognized that "when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989). Thus, for the medical care a prisoner receives to indicate a prison official "intentionally disregarded" their pain, the care must have been "grossly inadequate," *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986), or, put another way, the care must have been "so cursory as to amount to no care at all." *McElligot v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999). No reasonable factfinder could conclude that the medical care Williams received from Ingram—

---

[5]     On this point, Williams claims reporting his hip pain to have been a 10 out of 10 to Johnson and Ingram when he first arrived at the HCU. Ingram claims Williams reported pain at a 4 out of 10 to his left hip and 7 out of 10 to his left side, as indicated in Johnson's intake form. Moreover, Williams claims that Ingram diagnosed him with a broken hip on November 27—immediately after he was x-rayed and before the x-ray images were sent to the radiologist. Ingram, in contrast, claims she only knew for certain that Williams's hip was broken when she received the corrected radiology report on the afternoon of November 28.

where she immediately treated his pain, ordered him to receive an x-ray, and sent him to an ER for surgical treatment the moment she was able to confirm the fracture—meets this standard.

The delay between Williams's admittance to the HCU and his transfer to the ER does not indicate Ingram's deliberate indifference. A delay in access to medical treatment can violate the Eighth Amendment when it is "tantamount to unnecessary and wanton infliction of pain." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1995). However, it is only where a prison official *intentionally* delays medical care *without a medical explanation* that a reasonable factfinder can infer deliberate indifference from the mere fact that a prisoner's treatment was delayed. *See Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990).

There is no evidence indicating Ingram *intentionally* delayed Williams's transfer to the ER. In fact, there is no evidence indicating Ingram delayed Williams's treatment *at all*. Rather, the undisputed facts indicate that "[i]t was Dr. Walker's decision to hold Mr. Williams at [BCCF] until the x-ray report issue was cleared." (Doc. 66, p. 7). Thus, even if Williams could show that the decision to delay sending him to the hospital until the report was corrected somehow indicated deliberate indifference, the person responsible for that decision would not be Ingram. *See Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (deliberate indifference claims

require showing a defendant was "personally involved in acts or omissions that resulted in the constitutional deprivation")(emphasis added).

Additionally, the delay in sending Williams to the ER was explained by a legitimate reason—Williams's radiology report contained an error and "[a] patient cannot be sent to an outside facility with an incorrect radiology report." (Doc. 60, p. 7). There is no evidence suggesting Ingram and Dr. Walker fabricated this justification for the delay in order to subject Williams to "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Moreover, there is no evidence indicating Ingram delayed sending Williams to the hospital after receiving the corrected radiology report. Rather, the undisputed record demonstrates that immediately upon receiving the corrected radiology report, Ingram brought Williams to the HCU, conducted a follow-up examination, and "made arrangements . . . for Mr. Williams to be transported to the emergency room." (Doc. 60-1, p. 5). Because Ingram did not intentionally delay Williams's transfer to the ER and the delay was due to a legitimate medical reason, a reasonable factfinder could not infer deliberate indifference based on the delay.

Ingram's initial decision to treat Williams's pain with 60 mg of Toradol also does not indicate deliberate indifference. Notably, Williams never testified that the

Toradol ineffectively treated his pain.[6] The only evidence Williams proffered to attempt to show that the Toradol was ineffective was Ingram's testimony, saying that had Williams told her his pain was at a level of 10 out of 10, "he would have likely gotten a narcotic." (Doc. 60-3, p. 160:3-6). Saying a patient "would have likely" gotten stronger medication is not the same as saying the patient "should have" gotten stronger medication. Moreover, even taking Ingram's testimony to say she *should* have prescribed a stronger pain medication to Williams, such evidence would indicate, at most, medical malpractice, not deliberate indifference. *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Williams's assertion that "Ingram intentionally chose a less efficacious treatment" (doc. 64, p. 11) is unsupported by the record. There are no facts indicating that Ingram subjectively believed that Toradol was an ineffective treatment for Williams's pain at the time she administered it to him.[7] Notably,

---

[6] Although not determinative, the Court's research indicates that all cases finding that the pain treatment a prisoner received violated the Eighth Amendment involved a prisoner's *repeated* reports that the pain treatment they received was ineffective. *See e.g., McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999)(holding treating prisoner's pain with Tylenol despite "repeated complaints about the pain he was suffering from" constituted deliberate indifference); *Hathaway v. Coughlin*, 37 F.3d 63, 65 (2d Cir. 1994)("he complained about his hip pain on ten occasions in 1980 . . . on twenty-three occasions in 1981. . . [and] sixteen times in 1982.").

[7] Williams argues that the fact that Ingram listed "Tylenol #4" as a current medication on Williams's referral form, instead of Toradol, indicates that Ingram knew Toradol was an

Williams never claims that he requested a more powerful pain treatment from Ingram or anyone else at BCCF after receiving the Toradol. Furthermore, all evidence before the Court indicates that Ingram did not even have the authority to order Williams a stronger pain treatment than Toradol. (Doc. 60-3, p. 95:9-11)("I can't even order the Tylenol 4. So, someone had to give me the order for me to write it.").

Finally, the fact that Ingram did not provide Williams with other pain treatment in addition to the initial injection of Toradol also does not indicate deliberate indifference. Again, Williams provided no evidence indicating what pain, if any, he experienced after receiving the Toradol injection. He cites no evidence indicating that the Toradol wore off before he was sent to the ER, or evidence indicating *when* the Toradol wore off. Most notably, Williams cites no evidence indicating that he was in any pain whatsoever when he was in his cell after his initial visit to the HCU. The only evidence indicating he was in any pain after receiving the

---

ineffective treatment for Williams's pain. (Doc. 64, p. 11)("Recognizing that Toradol was obviously inadequate, [Ingram] lied on the referral form by stating Williams's current medication was a narcotic, Tylenol #4."). However, the undisputed evidence shows that Ingram did not lie on the referral form—she had ordered Tylenol #4 as the medication to be given to Williams after she received the corrected radiologist report, he just did not receive the Tylenol #4. The referral form did not refer to Toradol because Williams had received that injection over 24 hours prior to her completing the referral request, and Toradol was therefore not a "current medication."

Toradol injection is Ingram's referral request stating that he reported severe pain when he arrived back in the HCU. But when Williams told her that he was in pain, Ingram immediately treated that pain by sending him for treatment at the ER and prescribing him Tylenol #4.

Williams alleges Ingram intentionally "did not give [him] anything for pain after the Toradol wore off." (Doc. 64, p. 11). Again, this allegation is unsupported by a record cite or any evidence in the record. The undisputed evidence indicates that Williams could have "return[ed] to the [HCU] with any concerns," but he chose not to. (Doc. 60-3, pp. 124-125). Moreover, Ingram testified that if Williams had reported his medication had worn off, she "would have definitely [prescribed] something around the clock." (Doc. 60-3, p. 82:17-18). Based on the facts before the Court, it appears that Ingram only learned that Williams thought the Toradol ineffectively treated his pain when he filed this lawsuit.

In total, both of Williams's Toradol-based arguments reduce to a personal belief that Ingram should have given him a stronger pain treatment initially, or additional pain treatment later on. But that personal belief is not supported by evidence, and it could not indicate deliberate indifference, even if it was. *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) ("whether a government actor should have employed additional . . . forms of treatment is a classic example of a matter for

medical judgment and therefore not an appropriate basis for grounding liability under the Eight Amendment."); *see also Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment does not show deliberate indifference).

In summary, Williams has failed to show a genuine issue of material fact about Ingram's deliberate indifference. Accordingly, his Eighth Amendment claim fails as a matter of law. *See Rutledge v. Alabama*, 724 Fed.Appx. 731, 736 (11th Cir. 2018)(holding that because "Plaintiff had failed to show a genuine issue of material fact about the defendants' deliberate indifference to his medical needs. . . . the district court properly granted summary judgment to the defendants.").

## IV.   CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment is due to be **GRANTED**. The Court will enter an Order consistent with this Memorandum of Opinion.

DONE AND ORDERED ON DECEMBER 19, 2022.

_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
211854